# ADJUSTABLE RATE NOTE

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

January 19, 2006                    Covington                    Georgia
[Date]                                [City]                        [State]

100 BRADLEY STREET, Covington, GA  30016·
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $172,000.00                    (this amount is called "Principal"), plus interest, to the order of Lender. Lender is New Century Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          8.875 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on March 1, 2006          .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on 02/01/2036                          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 18400 Von Karman, Suite 1000, Irvine, CA 92612

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,368.51                    . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**MULTISTATE ADJUSTABLE RATE NOTE · LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) ·**
Single Family · Fannie Mae UNIFORM INSTRUMENT

-838N (0210)          Form 3520 1/01

VMP MORTGAGE FORMS · (800)521-729
Page 1 of 4          Initials: S.C.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of February, 2008                , and on that day every 6th     month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six And Three Tenth(s)               percentage points (                6.300 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than                10.375 % or less than               8.875 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One And One-half               percentage point(s) (               1.500 %) from the rate of interest I have been paying for the preceding 6               months. My interest rate will never be greater than               15.875 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.





-838N (0210)                    Page 2 of 4                    Form 3520 1/01

Initials: _SC_

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  fifteen
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but
only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by
a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and
all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to
me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described
above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right
to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.
Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by
delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the
Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note
will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different
address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made
in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this
Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a
guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder
may enforce its rights under this Note against each person individually or against all of us together. This means that any one
of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.
"Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means
the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to
the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same
date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in
this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment
in full of all amounts I owe under this Note. Some of those conditions read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
STEPHANIE CHANNELL                    -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                              -Borrower

*[Sign Original Only]*

Pay to the order of, without recourse
New Century Mortgage Corporation
By: _____
Steve Nagy
V.P. Records Management

D2015013645

BK:3394 PG:1-12

5159678415
0848497841

FILED IN OFFICE
CLERK OF COURT
12/30/2015 03:17 PM
LINDA D. HAYS,
CLERK
SUPERIOR COURT
NEWTON COUNTY,
GA

*Linda D. Hays*

INTANGIBLE TAX
PAID: $28.50

*WHEN RECORDED, RETURN TO:*
*FIRST AMERICAN TITLE INSURANCE CO.*
*1100 SUPERIOR AVENUE, SUITE 200*
*CLEVELAND, OHIO 44114*
*NATIONAL RECORDING*

This Document Prepared By:
JOYCE ELAINE ARGENT
WELLS FARGO BANK, N.A.
3476 STATEVIEW BLVD, MAC# X7801-03K
FORT MILL, SC 29715

When recorded mail to:
First American Title ███████
Loss Mitigation Title Services 1079.12
P.O. Box 27670
Santa Ana, CA 92799
RE: CHANNELL - PR DOCS

Tax/Parcel #: 0028D00000041 000
_____ [Space Above This Line for Recording Data] _____

| | |
|---|---|
| Original Principal Amount: $172,000.00 | Investor Loan No.: |
| Unpaid Principal Amount: $192,624.36 | Loan No: (scan barcode) |
| New Principal Amount $201,762.31 | |
| Total Cap Amount: $9,137.95 | |

## LOAN MODIFICATION AGREEMENT (SECURITY DEED)

Executed on this day: NOVEMBER 10, 2015
Borrower ("I"):[1] STEPHANIE CHANNELL
Borrower Mailing Address: 100 BRADLEY STREET, COVINGTON, GEORGIA 30016
Lender or Servicer ("Lender"): DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE
FOR MORGAN STANLEY ABS CAPITAL I INC. TRUST 2006-HE3
Lender or Servicer Address: 1761 EAST ST. ANDREW PLACE, SANTA ANA, CA 92705
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") JANUARY 19, 2006 and the Note
("Note") date of JANUARY 19, 2006

Property Address ("Property"): 100 BRADLEY STREET, COVINGTON, GEORGIA 30016

Legal Description:

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I" or "my")
shall include the plural (such as "we" or "our") and vice versa where appropriate.

Wells Fargo Custom Multistate Home Affordable Modification
Agreement – Single Family  10042015_368
First American Mortgage Solutions                    Page 1

BK:3394 PG:2

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF:

Prior instrument reference: Recorded on JANUARY 27, 2006 in INSTRUMENT NO. 001798  BOOK 2105  PAGE 395-414, of the Official Records of NEWTON COUNTY, GEORGIA

This Loan Modification Agreement ("Agreement") is made on **NOVEMBER 10, 2015** by and between Borrower, as obligor(s), or as title holder(s) to the Property, as the context may require, and Lender. Borrower's obligations under the Note are secured by a properly recorded Mortgage, dated the same date as the Note encumbering the Property. Borrower agrees that, except as expressly modified in this Agreement, the Note and the Mortgage remain in full force and effect and are valid, binding obligations upon Borrower, except as discharged in Bankruptcy, and are properly secured by the Property.

If my representations in Section 1, Borrower Representations, continue to be true in all material respects, then this Agreement will amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are hereafter referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in the Loan Documents.

In consideration of the covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows (notwithstanding anything to the contrary in the Loan Documents).

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement.

Nothing in this Agreement shall be understood or construed to be a satisfaction or release, in whole or in part of the Borrower's obligations under the Loan Documents. Further, except as otherwise specifically provided in this Agreement, the Loan Documents will remain unchanged, and Borrower and Lender will be bound by, and shall comply with, all of the terms and provisions thereof, as amended by this Agreement:

1. **Borrower Representations.**

   I certify, represent to Lender and agree:

   A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and/or (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future; I did not intentionally or purposefully default of the Mortgage Loan in order to obtain a loan modification;

   B. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the modification, are true and correct;

   C. If Lender requires me to obtain credit counseling in connection with the modification, I will do so;

   D. I have made or will make all payments required within this modification process;

   E. In consideration of the covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, it is agreed as follows (notwithstanding anything to the contrary in the Loan Documents).

BK:3394 PG:3

2.  The Modification.

A.  The modified principal balance of the Note will include amounts and arrearages that will be past due as of the Modification Effective Date (which may include unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, valuation, property preservation, and other charges not permitted under the terms of this modification, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to the modified loan. The new principal balance of my Note will be $201,762.31 (the "New Principal Balance"). Borrower understands that by agreeing to add the Unpaid Amounts to the principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. Borrower also understands that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

B.  $30,143.11 of the New Principal Balance shall be deferred (the "Deferred Balance") and will be treated as a non-interest bearing principal forbearance. I will not pay interest or make monthly payments on the Deferred Balance. The New Principal Balance less the Deferred Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $171,619.20. Interest at the rate of 3.0000% will begin to accrue on the Interest Bearing Principal Balance as of **DECEMBER 1, 2015** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **JANUARY 1, 2016**. Interest due on each monthly payment will be calculated by multiplying the Interest Bearing Principal Balance and the interest rate in effect at the time of calculation and dividing the result by twelve (12).    My payment schedule for the modified Loan is as follows:

| Months | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment | Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On |
|---|---|---|---|---|---|---|
| 60 | 3.0000% | 12/01/2015 | $614.37 | $264.93 | $879.30 | 01/01/2016 |
| 420 | 3.8750% | 12/01/2020 | $694.92 | $264.93 | $959.85 | 01/01/2021 |

**\* This includes an escrow shortage amount to be paid over the first 60 month term. After your modification is complete, escrow payments adjust at least annually in accordance with applicable law; therefore, the total monthly payment may change accordingly.**

The above terms shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

Borrower agrees to pay in full the Deferred Balance and any other amounts still owed under the Loan Documents by the earliest of: (i) the date an interest in the Property is sold or transferred, (ii) the date on which the entire Interest Bearing Principal Balance is paid off, or (iii) the Maturity Date.

Borrower agrees that any partial prepayments of Principal may be applied at Lender's discretion first to any Deferred Balance before applying such partial prepayment to other amounts due.

**Notice to Borrower:** The Deferred Balance will result in a lump sum payment due at the time of



BK:3394 PG:4

loan maturity or earlier upon payoff of the loan. If the Borrower does not have the funds to pay the lump sum payment when it comes due, the Borrower may have to obtain a new loan against your property. In that case, the Borrower may have to pay commissions, fees, and expenses for the arranging of the new loan. In addition, if the Borrower is unable to make the monthly payments or the lump sum payment, the Borrower may lose the property and all equity through foreclosure. Keep this in mind in deciding upon this modification. The lump sum payment on this loan is due **DECEMBER 1, 2055** or upon earlier payoff of the loan.

3.  **Loan Modification Terms.**

This Agreement hereby modifies the following terms of the Loan Documents as described herein above as follows:

   A.  The current contractual due date has been changed from **NOVEMBER 1, 2014** to **JANUARY 1, 2016**. The first modified contractual due date is **JANUARY 1, 2016**.

   B.  The maturity date has been extended from **JANUARY 1, 2050** to **DECEMBER 1, 2055**.

   C.  The amount of Recoverable Expenses* to be capitalized will be U.S. **$597.50**.

      *Recoverable Expenses may include, but are not limited to: Title, Attorney fees/costs, BPO/Appraisal, and/or Property Preservation/Property Inspections.

   D.  Lender will forgive outstanding Other Fees U.S. **$0.00**. Other Fees may include, but are not limited to: Prior Deferred Interest, appraisal fees.

   E.  Lender will forgive outstanding NSF Fees U.S. **$0.00**.

   F.  Lender agrees to waive all unpaid Late Charges in the amount of U.S. **$200.91**.

   G.  The amount of interest to be included capitalized will be U.S. **$5,577.78**.

   H.  The amount of the Escrow Advance to be capitalized will be U.S. **$2,962.67**.

4.  **Additional Agreements.**

I agree to the following:

   A.  If applicable, the Note may contain provisions allowing for changes in the interest rate and the monthly payment. The Note limits the amount the Borrower's interest rate can change at any one time and the maximum rate the Borrowers must pay.

   B.  If a biweekly loan, the Loan will convert to a monthly payment schedule. References in the Loan Documents to "biweekly," "every two weeks," and "every other Monday" shall be read as "monthly," except as it relates to the Modified Maturity Date. Interest will be charged on a 360-day year, divided into twelve (12) segments. Interest charged at all other times will be computed by multiplying the interest bearing principal balance by the interest rate, dividing the result by 365, and then multiplying that daily interest amount by the actual number of days for which interest is then due. As part of the conversion from biweekly to monthly payments, any automatic withdrawal of

BK:3394 PG:5

payments (auto drafting) in effect with Lender for the Loan are cancelled.

C.  **Funds for Escrow Items.** I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.E. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and Agreement contained in the Loan Documents, as the phrase "covenant and Agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.E.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to

**BK:3394 PG:6**

make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

D.  If the Borrowers balance has been reduced as a result of this new Agreement, it is understood that any credit life, accident and health, and involuntary unemployment insurance written in connection with this loan has been cancelled, and that any refund of unearned premiums or charges made because of the cancellation of such credit insurance is reflected in the amount due under this Agreement. *Exception:* In the state of Califomia, Life, A&H, and IUI insurance must be cancelled, with refunds applied to the account prior to entry of the settlement transaction, even though there is no reduction in balance as part of the settlement.

E.  If this loan has "Monthly Add-On Premium" Credit Life or Credit Accident & Health Insurance coverage, it is understood and agreed that the Borrowers acceptance of this Agreement will result in the cancellation of the above-mentioned insurances.

F.  If the Borrower's home owners insurance should lapse, **Wells Fargo Home Mortgage** reserves the right to place Lender Placed Insurance (LPI) on the account. If LPI is placed on the account the monthly payment could increase. All other terms of the modification Agreement will not be affected by the LPI and will remain in effect with accordance to this Agreement.

G.  If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Loan Documents. If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Loan Documents. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Loan Documents without further notice or demand on Borrower.

H.  If Borrower has a pay option adjustable rate mortgage Loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan.

I.  If Borrower fails to pay Lender the amount due and owing or to pay any monthly payment on the dates above, Borrower shall surrender the Property to Lender. If Borrower fails or refuses to surrender the Property to Lender, Lender may exercise any and all remedies to recover the Property as may be available to Lender pursuant to its security interest and lien and applicable law. These remedies may include the recovery of reasonable attorney's fees actually incurred, plus legal expenses and expenses for entering on the Property to make repairs in any foreclosure action filed to enforce the Lender lien. Lender's rights and remedies extend only to the Property, and any action related to the Property itself and not to recovery of any amount owed to Lender under the Note as modified herein, which has been discharged in bankruptcy.

J.  If included, the undersigned Borrower(s) acknowledge receipt and acceptance of the 1-4 Family Modification Agreement Rider Assignment of Rents.

K.  If included, the undersigned Borrower(s) acknowledge receipt and acceptance of the Notice of

**BK:3394 PG:7**

Special Flood Hazard disclosure.

L.   CORRECTION AGREEMENT: The undersigned Borrower(s), for and in consideration of the approval, closing and funding of this Modification, hereby grants **Wells Fargo Home Mortgage**, as lender, limited power of attorney to correct and/or initial all typographical or clerical errors discovered in the Modification Agreement required to be signed. In the event this limited power of attorney is exercised, the undersigned will be notified and receive a copy of the document executed or initialed on their behalf. This provision may not be used to modify the interest rate, modify the term, modify the outstanding principal balance or modify the undersigned's monthly principal and interest payments as modified by this Agreement. Any of these specified changes must be executed directly by the undersigned. This limited power of attorney shall automatically terminate in 120 days from the closing date of the undersigned's Modification. Borrower agrees to make and execute such other documents or papers as necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to their heirs, executors, administrators, and assigns of the Borrower.

M.   If the Borrower's Loan is currently in foreclosure, the Lender will attempt to suspend or cancel the foreclosure action upon receipt of the first payment according to this Agreement. Lender agrees to suspend further collection efforts as long as Borrowers continue making the required payments under this Agreement.

N.   All the rights and remedies, stipulations, and conditions contained in the Loan Documents relating to default in the making of payments under the Loan Documents shall also apply to default in the making of the modified payments hereunder.

O.   This Agreement shall supersede the terms of any modification, forbearance, trial period plan or other mortgage assistance that the Borrower previously entered into with Lender.

P.   In cases where the Loan has been registered with Mortgagee who has only legal title to the interests granted by the Borrower in the Loan Documents, Mortgagee has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property and to take any action required of Lender including, but not limited to, releasing and canceling the Loan.

Q.   If the Loan Documents govern a home equity loan or line of credit, then Borrower agrees that as of the Modification Effective Date, the right to borrow new funds under the home equity loan or line of credit is terminated. This means that Borrower cannot obtain additional advances and must make payments according to this Agreement. Lender may have previously terminated or suspended the right to obtain additional advances under the home equity loan or line of credit, and if so, Borrower confirms and acknowledges that no additional advances may be obtained.

R.   By signing this Agreement the Borrower hereby consents to being contacted concerning their loan at any cellular or mobile telephone number they may have. This includes text messages and telephone calls including the use of automated dialing systems to contact any cellular or mobile telephone. The Borrower may be billed by the cellular or mobile carrier for any text messages that Lender may send. Any calls Lender places to the Borrower's cellular or mobile phone may incur normal airtime charges assessed by the mobile carrier.

S.   Unless this Agreement is executed without alteration and is signed and returned along with the

BK:3394 PG:8

following documents with the payment, if required, within 15 days from the date of this letter in the enclosed, prepaid overnight envelope, it will be of no force or effect and the Loan will remain subject to all existing terms and conditions provided in the Loan Documents. Upon receipt of a properly executed Agreement, this Agreement will become effective on **DECEMBER 1, 2015**.

T.   I agree that this Agreement will be null and void if the Lender is unable to receive all necessary title endorsement(s), title insurance product(s) and/ or subordination Agreement(s).

U.   **This Agreement modifies an obligation secured by an existing security Instrument recorded in NEWTON COUNTY, GEORGIA, upon which all recordation taxes have been paid. As of the date of this Agreement, the unpaid principal balance of the original obligation secured by the existing security instrument is $192,624.36. The principal balance secured by the existing security instrument as a result of this Agreement is $201,762.31, which amount represents the excess of the unpaid principal balance of this original obligation.**

**All Borrowers are required to sign and date this Agreement in blue or black ink only as the borrowers' name appears below. If signed using any other color or method, the document will not be accepted and another copy of the Agreement will be sent to the Borrower to be signed.**

**By signing below, all Borrowers certify they have read this Agreement in its entirety, that all Borrowers know and understand the meaning and intent of this Agreement and that all Borrowers enter into this Agreement knowingly and voluntarily. By signing below, all Borrowers agree to all terms and conditions described on every page of this Agreement.**



BK:3394 PG:9

In Witness Whereof, I have executed this Agreement.

*Stephanie Channell*                                    11/24/15
Borrower:STEPHANIE CHANNELL                                  Date
_____ [Space Below This Line for Acknowledgments] _____

State of _Georgia_
County of _Newton_        ss.

Signed, sealed and delivered on this _24th_ day of _November_, _2015_ in the
presence of:

_____                          _____
Unofficial Witness                                  Notary Public, state of Georgia

                                                    _____
                                                    Mia Johnson        Printed Name

                                                    _12/5/18_
                                                    My Commission Expires

Document Prepared By
JOYCE ELAINE ARGENT
WELLS FARGO BANK, NA AS ATTORNEY-IN-FACT FOR
DEUTSCHE BANK NATIONAL TRUST COMPANY, AS
TRUSTEE FOR MORGAN STANLEY ABS CAPITAL I INC.
TRUST 2006-HE3
1761 EAST ST. ANDREW PLACE
SANTA ANA, CA 92705

[Notary Seal: MIA JOHNSON NOTARY GEORGIA EXPIRES Dec. 5, 2017 PUBLIC NEWTON COUNTY]

BK:3394 PG:10

In Witness Whereof, the Lender have executed this Agreement.

WELLS FARGO BANK, NA AS ATTORNEY-IN-FACT FOR DEUTSCHE BANK NATIONAL TRUST
COMPANY, AS TRUSTEE FOR MORGAN STANLEY ABS CAPITAL I INC. TRUST 2006-HE3

By: (print name) **Kaoyen Vang**          (sign) _____    12/5/2015
(title) **Vice President Loan Documentation**                                 Date

_____  12/15/15                    _____  12/15/15
                  Witness                                       Witness

Halimo Y Adem                              Mai Vang
Witness – Printed Name                     Witness – Printed Name

_____ [Space Below This Line for Acknowledgments] _____

STATE OF Minnesota              COUNTY OF Dakota

The  instrument  was  acknowledged  before  me  this  December 15, 2015    by

Kaoyen Vang                                                            the

**Vice President Loan Documentation**   of WELLS FARGO BANK, NA AS ATTORNEY-IN-

FACT FOR DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR MORGAN

STANLEY ABS CAPITAL I INC. TRUST 2006-HE3, a   **Vice President Loan Documentation**   ,

on behalf of said company.

_____
Notary Public

Printed Name: Carl J Tucker
My commission expires: 1/31/2021

THIS DOCUMENT WAS PREPARED BY:
JOYCE ELAINE ARGENT
WELLS FARGO BANK, N.A.
3476 STATEVIEW BLVD, MAC# X7801-03K
FORT MILL, SC 29715

CARL J TUCKER
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2021

BK:3394 PG:11

EXHIBIT A

BORROWER(S): STEPHANIE CHANNELL

LOAN NUMBER: (scan barcode)

LEGAL DESCRIPTION:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 91 OF THE 10TH DISTRICT OF NEWTON COUNTY, GEORGIA, BEING LOT 41 OF BENEDICT PLACE SUBDIVISION, AS PER PLAT RECORDED IN PLAT BOOK 40, PAGES 130-133 (MORE PARTICULARLY DESCRIBED ON PAGE 131), NEWTON COUNTY, GEORGIA RECORDS, WHICH PLAT IS INCORPORATED HEREIN BY REFERENCE AND MADE A PART HEREOF.

ALSO KNOWN AS: 100 BRADLEY STREET, COVINGTON, GEORGIA 30016



CHANNELL

GA

FIRST AMERICAN ELS
MODIFICATION AGREEMENT

BK:3394 PG:12

Date: NOVEMBER 10, 2015
Loan Number: (scan barcode)
Lender: DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR MORGAN
STANLEY ABS CAPITAL I INC. TRUST 2006-HE3

Borrower: STEPHANIE CHANNELL

Property Address: 100 BRADLEY STREET, COVINGTON, GEORGIA 30016

# NOTICE OF NO ORAL AGREEMENTS

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE
PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR,
CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE
ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.**

**Receipt of Notice.** The undersigned hereby admit to having each received and read a copy of this Notice on or
before execution of the Loan Agreement. "Loan Agreement" means one or more promises, promissory notes,
agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any
combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or
agrees to loan or delay repayment of money, goods or any other thing of value or to otherwise extend credit or make
a financial accommodation.

Borrower:
STEPHANIE CHANNELL

# HOME AFFORDABLE MODIFICATION AGREEMENT
## (Step Two of Two-Step Documentation Process)

Borrower ("I"):[1] **STEPHANIE CHANNELL**
Lender or Servicer ("Lender"): **America's Servicing Company**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): **01/19/2006**
Loan Number ▮
Property Address *[and Legal Description if recordation is necessary]* ("Property"):
**100 BRADLEY ST**
**COVINGTON, GA 30016**

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.  **My Representations**. I certify, represent to Lender and agree:

    A.   I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.   I live in the Property as my principal residence, and the Property has not been condemned;

    C.   There has been no change in the ownership of the Property since I signed the Loan Documents;

    D.   I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

    E.   Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

    F.   If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

    G.   I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

2.  **Acknowledgements and Preconditions to Modification**. I understand and acknowledge that:

    A.   If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

B.   I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.   **The Modification.** If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **01/01/2010** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on **02/01/2010.**

A.   The new Maturity Date will be:**01/01/2050.**

B.   The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$211,583.34** (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.   **$21,000.00** of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and I will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is **$190,583.34**. Interest at the rate of **2.000%** will begin to accrue on the Interest Bearing Principal Balance as of **01/01/2010** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **02/01/2010**. My payment schedule for the Modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and interest Payment | Monthly Escrow Payment Amount | Total Monthly Payment | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-5 | 2.000 | 01/01/2010 | $577.14 | 381.12 adjusts annually after 1 year | 958.26 adjusts annually after 1 year | 02/01/2010 | 60 |
| 6 | 03.0000 | 01/01/2015 | $670.50 | Adjusts Annually | Adjusts Annually | 02/01/2015 | 12 |
| 7 | 04.0000 | 01/01/2016 | $769.04 | Adjusts Annually | Adjusts Annually | 02/01/2016 | 12 |
| 8-40 | 05.0000 | 01/01/2017 | $871.98 | Adjusts Annually | Adjusts Annually | 02/01/2017 | 396 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3157**                                                                     3/09 *(page 2 of 5 pages)*

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan. My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

D. I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E. If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

4. **Additional Agreements.** I agree to the following:

A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B. That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. That this Agreement constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account.

E. That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H. That, as of the Modification Effective Date, I understand that the Lender will only allow the

transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3.  A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan.  Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I.   That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J.   That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.   That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement.  I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error.  If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L.   Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.  In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M.   That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity.   In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.

N.   I agree that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents."  I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

In Witness Whereof, the Lender and I have executed this Agreement.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3157                                                                                                       3/09 (page 4 of 5 pages)

_____ 01-11-10

America's Servicing Company
Halimo Y. Adem
VP of Loan Documentation

By:_____

_____

Date

_____(Seal)
STEPHANIE CHANNELL
_____
Date  1/8/2010

_____(Seal)

_____

Date

_____[Space Below This Line For Acknowledgement]_____

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT   Form 3157**                                          3/09 *(page 5 of 5 pages)*

# HOME AFFORDABLE MODIFICATION AGREEMENT
## (Step Two of Two-Step Documentation Process)

Borrower ("I"):[1] STEPHANIE CHANNELL
Lender or Servicer ("Lender"): **America's Servicing Company**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): **01/19/2006**
Loan Number ▇▇▇▇▇▇▇▇
Property Address *[and Legal Description if recordation is necessary]* ("Property"):
**100 BRADLEY ST**
**COVINGTON, GA 30016**

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.    **My Representations.** I certify, represent to Lender and agree:

    A.    I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.    I live in the Property as my principal residence, and the Property has not been condemned;

    C.    There has been no change in the ownership of the Property since I signed the Loan Documents;

    D.    I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

    E.    Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

    F.    If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

    G.    I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

2.    **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

    A.    If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

B.  I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) has occurred.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.  **The Modification**.  If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **01/01/2010** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived.  I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect.  The first modified payment will be due on **02/01/2010**.

A.  The new Maturity Date will be:**01/01/2050**.

B.  The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan.  The new principal balance of my Note will be **$211,583.34** (the "New Principal Balance").  I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.  **$21,000.00** of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and I will not pay interest or make monthly payments on this amount.  The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is **$190,583.34**. Interest at the rate of **2.000%** will begin to accrue on the Interest Bearing Principal Balance as of **01/01/2010** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **02/01/2010**.  My payment schedule for the Modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and interest Payment | Monthly Escrow Payment Amount | Total Monthly Payment | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|----------------------------------------|-------------------------------|-----------------------|-------------------|----------------------------|
| 1-5 | 2.000 | 01/01/2010 | $577.14 | 381.12 adjusts annually after 1 year | 958.26 adjusts annually after 1 year | 02/01/2010 | 60 |
| 6 | 03.0000 | 01/01/2015 | $670.50 | Adjusts Annually | Adjusts Annually | 02/01/2015 | 12 |
| 7 | 04.0000 | 01/01/2016 | $769.04 | Adjusts Annually | Adjusts Annually | 02/01/2016 | 12 |
| 8-40 | 05.0000 | 01/01/2017 | $871.98 | Adjusts Annually | Adjusts Annually | 02/01/2017 | 396 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3157                                                                3/09 *(page 2 of 5 pages)*

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan. My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

D.   I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.   If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

4.   **Additional Agreements.** I agree to the following:

A.   That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.   That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Lender.

C.   To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.   That this Agreement constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account.

E.   That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F.   That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G.   That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H.   That, as of the Modification Effective Date, I understand that the Lender will only allow the

transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I.  That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J.  That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.  That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L.  Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M.  That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.

N.  I agree that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

In Witness Whereof, the Lender and I have executed this Agreement.

01-11-10                              _Stephanie Channell_(Seal)
                                       STEPHANIE CHANNELL
**America's Servicing Company**
                Halimo Y. Adem        _1/8/2010_
             VP of Loan Documentation  Date

By:_____      _____(Seal)

_____  _____
Date                                  Date

_____[Space Below This Line For Acknowledgement]_____

20

INDEXED

New Century Mortgage Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

DOC# 001798
FILED IN OFFICE
01/27/2006  10:32 AM
BK:2105  PG:395-414
LINDA D. HAYS
CLERK OF SUPERIOR COURT
NEWTON COUNTY
GEORGIA INTANGIBLE
TAX PAID
$516.00
DATE 1/27/2006

Prepared By: *Amy Hall*
Amy Hall

CLERK OF SUPERIOR COURT
NEWTON COUNTY

New Century Mortgage Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

PIU# 28041

—————————————[Space Above This Line For Recording Data]—————————————

# SECURITY DEED

AFTER RECORDING RETURN TO:
SWAFFORD & HAYS SETTLEMENT SERVICES
9041 EXECUTIVE PARK DRIVE SUITE 400
KNOXVILLE, TN 37923

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  January 19, 2006
together with all Riders to this document.
**(B) "Borrower"** is STEPHANIE CHANNELL *unmarried*

*100 Bradley St. Covington GA 30016*

Borrower is the grantor under this Security Instrument.
**(C) "Lender"** is New Century Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of California

GEORGIA-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

 -6(GA) (0005).02

Page 1 of 14          Initials: *S-C*

Form 3011  1/01

VMP MORTGAGE FORMS - (800)521-7291

BK:2105  PG:396

Lender's address is 18400 Von Karman, Suite 1000, Irvine, CA 92612

Lender is the grantee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated January 19, 2006
The Note states that Borrower owes Lender ONE HUNDRED SEVENTY-TWO THOUSAND AND 00/100
Dollars
(U.S. $172,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than 02/01/2036

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

Arm Rider Addendum
Wavier of Borrowers rights

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

Initials:  

BK:2105  PG:397

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the
            County                    of                    Newton                    :
         [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]
See Legal Description Attached Hereto and Made a Part Hereof

Parcel ID Number: 0028D0000041                              which currently has the address of
100 BRADLEY STREET                                                                    [Street]
Covington                                              [City] , Georgia  30016-          [Zip Code]
("Property Address"):

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

 -6(GA) (0005).02
®

Page 3 of 14

Initials: SC

Form 3011  1/01

BK:2105    PG:398

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

BK:2105   PG:400

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to; earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

BK:2105  PG:401

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying

Initials: 

BK:2105  PG:402

reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**





BK:2105  PG:403

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials:

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: SC

BK:2105  PG:405

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: SC

BK=2105  PG=406

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



BK:2105   PG:407

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

**25. Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

**26. Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

_Stephanie Channell_ (Seal)
STEPHANIE CHANNELL          -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

STATE OF GEORGIA, NEWTON                    County ss:

Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

_____                              County
Notary Public,
State of Georgia

GUS L. FRIEDMAN
NOTARY
EXPIRES
GEORGIA
JULY 9, 2009
PUBLIC
DEKALB COUNTY

SEAL AFFIXED

VMP -6(GA) (0005).02          Page 14 of 14          Form 3011   1/01

BK:2105  PG:409

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this 19th     day of January, 2006               ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
New Century Mortgage Corporation

("Lender") of the same date and covering the property described in the Security Instrument
and located at: 100 BRADLEY STREET, Covington, GA  30016-

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of              8.875 %. The Note provides
for changes in the interest rate and the monthly payments, as follows:
**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of February, 2008               ,
and on that day every 6th       month thereafter. Each date on which my interest rate
could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for six month U.S. dollar-denominated
deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most
recent Index figure available as of the first business day of the month immediately preceding
the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based
upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
Six And Three Tenth(s)                                 percentage points
(               6.300 %) to the Current Index. The Note Holder will then round the result of

**MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN
THE WALL STREET JOURNAL) - Single Family - Fannie Mae Uniform Instrument**
**-838R (0402) Form 3138 1/01**
Page 1 of 3        Initials: SC
VMP Mortgage Solutions, Inc.
(800)521-7291

**BK:2105    PG:410**

this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than
      10.375 % or less than                8.875 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than  One And One-half                                                          percentage points
(                            1.500 %) from the rate of interest I have been paying for the preceding
6              months. My interest rate will never be greater than              15.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Initials: _SC_

BK=2105   PG=411

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Stephanie Channell_ (Seal)
STEPHANIE CHANNELL          -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

VMP®-838R (0402)                Page 3 of 3                Form 3138 1/01

BK:2105   PG:412

# ADJUSTABLE RATE RIDER ADDENDUM
### (Libor Index - Rate Caps)

This Adjustable Rate Rider Addendum is made this **19th** day of **January** **2006** ,
and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") and Adjustable Rate Rider (the
"Rider") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's
Note to
**New Century Mortgage Corporation** (the "Lender").

Property securing repayment of the Note is described in the Security Instrument and located at:
**100 BRADLEY STREET, Covington, GA 30016-**
(Property Address)

To the extent that the provisions of this Adjustable Rate Rider Addendum are inconsistent with the
provisions of the Note and/or Security Instrument and/or Rider, the provisions of this Addendum shall
prevail over and supersede any such inconsistent provisions of the Note and/or Security Instrument and/or
Rider.

In addition to the covenants and agreements made in the Note, Security Instrument, and Rider, Borrower and
Lender further covenant and agree as follows:

4.    **(D) LIMITS ON INTEREST RATE CHANGES**
     **The interest rate I am required to pay at the first change date will not be greater than**
**10.375 %** or less than **8.875 %**. Thereafter, my interest rate
will never be increased or decreased on any single Change Date by more than
**One And One-half** percentage point(s) ( **1.500 %**) from
the rate of interest I have been paying for the preceding **6** months. My interest rate will never be
greater than **15.875 %** or less than **8.875 %**.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Adjustable Rate Rider Addendum.

*[signature]*
**STEPHANIE CHANNELL**

NCMC
Adjustable Rate Rider Addendum
RE-102    (082296)                    Page 1 of 1

GEORGIA-
GRANTOR: Stephanie Channell

BK:21995    PG:413

LENDER: New Century Mortgage Corp.

DATE OF SECURITY DEED: 01/19/06

## WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY:  (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF;  (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF;  (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED;  (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:

Signed, Sealed and delivered in the presence of:

_Stephanie Channell_ (Seal)
Stephanie Channell    -Grantor

_____ (Seal)
                         -Grantor

_____ (Seal)
                         -Grantor

_____ (Seal)
                         -Grantor

Notary Public

SEAL AFFIXED

GUS L. FRIEDMAN
NOTARY
EXPIRES
GEORGIA
JULY 9, 2009
PUBLIC
DEKALB COUNTY

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure upon a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights.  After said review with and expination to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrower(s), it is my opinion that the Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me on the date set forth above.

_Patricia King_
Notary Public, GA

Notary PUBLIC

SEAL AFFIXED

_____
Closing Attorney

## FORECLOSURE CLOSING DISCLOSURE

O.C.G.A. Section 7-1-014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.

_Stephanie Channell_
Stephanie Channell

_____

_____                    _____

BK:2105   PG:414

## EXHIBIT A

Situated in Covington, Newton County, State of GA and being described as follows:

All that tract or parcel of land lying and being in Land Lot 91 of the 10th District of Newton County, Georgia, being Lot 41 of Benedict Place Subdivision, as per plat recorded in Plat Book 40, Pages 130-133 (more particularly described on Page 131), Newton County, Georgia records, which plat is incorporated herein by reference and made a part hereof.

The above legal description being the same as the last deed of record, no boundary survey having been made at the time of this conveyance.

Parcel #28D 41

BEING the same property conveyed to Stephanie Channell, by deed from Ross Mundy Custom Homes, Inc., dated 08-13-04, recorded 08-18-04, in Book 1734, page 471, in the Office of the Clerk of the Superior Court of Newton County, GA.

This Derivation Clause represents a 24 month Chain of Title.

The above information is to be used for reference purposes only and not to be relied on as evidence of title and/or encumbrances. Accordingly, said information is furnished at a reduced rate, and the Company's liability shall in no event exceed the amount paid for said information.

100 Bradley Street, Covington, GA  30016

SC.

FILED IN OFFICE
07/19/2012   10:53 AM
BK:3026  PG:2-2
LINDA D. HAYS
CLERK OF SUPERIOR COURT
NEWTON COUNTY

Recording Requested By: WELLS FARGO BANK, N.A.
When Recorded Return To: DEFAULT ASSIGNMENT, WELLS FARGO BANK, N.A. MAC: X9999-018 PO BOX 1629, MINNEAPOLIS, MN  55440-9790

## CORPORATE ASSIGNMENT OF SECURITY DEED

Newton, Georgia
"CHANNELL"

Date of Assignment: July 17th, 2012
Assignor: NEW CENTURY MORTGAGE CORPORATION BY WELLS FARGO BANK, N.A., AS THEIR ATTORNEY-IN-FACT at 18400 VON KARMAN, SUITE 1000, IRVINE, CA  92612
Assignee: DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR MORGAN STANLEY ABS CAPITAL I INC. TRUST 2006-HE3 at 1761 EAST SAINT ANDREW PLACE, SANTA ANA, CA  92705-4934

Executed By: STEPHANIE CHANNELL UNMARRIED 100 BRADLEY ST. COVINGTON GA 30016  To: NEW CENTURY MORTGAGE CORPORATION
Date of Security Deed: 01/19/2006  Recorded:  01/27/2006  in Book/Reel/Liber: 2105 Page/Folio: 395 as Instrument No.: 001798  In the County of Newton, State of Georgia.

Property Address: 100 BRADLEY STREET, COVINGTON, GA  30016

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $172,000.00 with interest, secured thereby, with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

NEW CENTURY MORTGAGE CORPORATION BY WELLS FARGO BANK, N.A., AS THEIR ATTORNEY-IN-FACT
On 7/17/2012

By: **MEGAN AVON**
Vice President Loan Documentation

WITNESS
BRI SALWEY

WITNESS

CORPORATE SEAL AFFIXED

STATE OF Iowa
COUNTY OF Polk

On 7/17/2012, before me, Alexander Baugh, a Notary Public in and for Polk in the State of Iowa, personally appeared MEGAN AVON, Vice President Loan Documentation, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

Alexander Baugh
Notary Expires: 2/2/15

ALEXANDER BAUGH
Commission Number 771486
My Commission Expires
February 2, 2015

SEAL AFFIXED          (This area for notarial seal)

```
FILED IN OFFICE
05/28/2009   11:02 AM
BK:2721   PG:346-346
LINDA D. HAYS
CLERK OF SUPERIOR COURT
NEWTON COUNTY
```

**PREPARED BY AND
RETURN TO:** Lashundra Worthy
SHAPIRO & SWERTFEGER
2872 Woodcock Boulevard
Duke Building, Ste. 100
Atlanta, Georgia 30341
(770) 220-2535

PLEASE CROSS REFERENCE TO Deed Book **2105**, Page **395**

**STATE OF** Georgia                                    **07-4025/Channell, Stephanie**
**COUNTY OF** DeKalb                                              **Loan #**

### CORPORATE ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby transfers, assigns, sells, conveys and delivers to **Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital I Inc. 2006-HE3**, whose address is **3476 Stateview Blvd., MAC# X7801-013, Fort Mill, South Carolina 29715** (hereinafter referred to as Assignee), a certain Deed to Secure Debt (hereinafter called Deed) dated **January 19, 2006**, between **Stephanie Channell** (grantor) and **New Century Mortgage Corporation** (grantee), said Deed being recorded in Deed Book **2105**, page **395**, NEWTON County Records; together with the Note and the debt evidenced thereby which said Deed was given to secure; and does hereby deed, grant, bargain, sell and convey to the said Assignee all of the property in the said Deed, together with all the rights, powers and privileges therein contained in as full, ample and complete manner as the undersigned is authorized to exercise the same.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed by its duly authorized corporate officers as of **March 4, 2009.**

Signed and delivered
in the presence of:

New Century Mortgage Corporation by Wells Fargo Bank, N.A. as Attorney-in-Fact

(1) _____ (Unofficial Witness)

By: _____
Philip A. Hasty, Vice President
Loan Documentation

(2) _____ Notary Public

Attest: _____
Sean R. Quirk, Asst. Secretary
Loan Documentation

My Commission Expires:

NOTARY SEAL

**SEAL AFFIXED**

# DRIVE-BY BPO
by ClearCapital

**100 BRADLEY ST**
COVINGTON, GA 30016

Loan Number

**$260,000**
● As-Is Value

Please Note: This report was completed with the following assumptions: Market Approach: **Other** , Marketing Time: **Typical** . Important additional information relating to this report, including use and restrictions, is contained in an attached addendum which is an integral part of this report.

| | | | |
|---|---|---|---|
| **Address** | 100 Bradley St, Covington, GA 30016 | **Order ID** | 8376835 | **Property ID** | 33163217 |
| **Inspection Date** | 08/11/2022 | **Date of Report** | 08/12/2022 | | |
| **Loan Number** | | **APN** | 0028D00000041000 | | |
| **Borrower Name** | STEPHANIE CHANNELL | **County** | Newton | | |

**Tracking IDs**

| | | | |
|---|---|---|---|
| **Order Tracking ID** | Wed Aug 10 22 12:00P - Wed Aug 10 22 5:00P Batch | **Tracking ID 1** | 13623282.1 |
| **Tracking ID 2** | 189 | **Tracking ID 3** | -- |

## General Conditions

| | |
|---|---|
| **Owner** | Channell Stephanie |
| **R. E. Taxes** | $2,377 |
| **Assessed Value** | $80,080 |
| **Zoning Classification** | Residential |
| **Property Type** | SFR |
| **Occupancy** | Occupied |
| **Ownership Type** | Fee Simple |
| **Property Condition** | Fair |
| **Estimated Exterior Repair Cost** | $500 |
| **Estimated Interior Repair Cost** | $0 |
| **Total Estimated Repair** | $500 |
| **HOA** | No |
| **Visible From Street** | Visible |
| **Road Type** | Public |

**Condition Comments**

Based on exterior observation the subject appears to be in fair condition. The subject conforms to the surrounding properties and neighborhood.

## Neighborhood & Market Data

| | |
|---|---|
| **Location Type** | Suburban |
| **Local Economy** | Stable |
| **Sales Prices in this Neighborhood** | Low: $55,000 High: $875,000 |
| **Market for this type of property** | Increased 2 % in the past 6 months. |
| **Normal Marketing Days** | <90 |

**Neighborhood Comments**

The subject is located in a suburban neighborhood with increasing property values and the economy and employment conditions are stable, neighborhood market trends are stable, conditions is stable, supply & demand is stable, prevalence of REO is stable and seller concessions is stable.

# DRIVE-BY BPO
by ClearCapital



**100 BRADLEY ST**
COVINGTON, GA 30016

Loan Number

**$260,000**
● As-Is Value

## Current Listings

| | Subject | Listing 1 * | | Listing 2 | | Listing 3 | |
|---|---|---|---|---|---|---|---|
| Street Address | 100 Bradley St | 3364 Concord Corner Se | | 46 Russell Braden Road | | 255 Long Creek Dr | |
| City, State | Covington, GA | Conyers, GA | | Covington, GA | | Covington, GA | |
| Zip Code | 30016 | 30013 | | 30016 | | 30016 | |
| Datasource | Tax Records | MLS | | MLS | | MLS | |
| Miles to Subj. | -- | 3.98 ¹ | | 0.32 ¹ | | 1.73 ¹ | |
| Property Type | SFR | SFR | | SFR | | SFR | |
| Original List Price $ | $ | $249,000 | | $305,000 | | $298,000 | |
| List Price $ | | $249,000 | | $262,000 | | $298,000 | |
| VALUE ADJUSTMENTS | Description | Description | +(-) Adj. | Description | +(-) Adj. | Description | +(-) Adj. |
| Original List Date | | 08/05/2022 | -- | 04/11/2022 | -- | 06/30/2022 | -- |
| DOM · Cumulative DOM | -- · -- | 5 · 7 | -- | 121 · 123 | -- | 41 · 43 | -- |
| Age (# of years) | 18 | 47 | $725 | 67 | $1,225 | 21 | -- |
| Condition | Fair | Fair | -- | Average | -$18,000 | Good | -$25,000 |
| Sales Type | | Fair Market Value | | Fair Market Value | | Fair Market Value | |
| Location | Neutral ; Residential | Neutral ; Residential | -- | Neutral ; Residential | -- | Neutral ; Residential | -- |
| View | Neutral ; Residential | Neutral ; Residential | -- | Neutral ; Residential | -- | Neutral ; Residential | -- |
| Style/Design | 1 Story Ranch | 1 Story Ranch | -- | 1 Story Ranch | -- | Split Split entry | -$1,000 |
| # Units | 1 | 1 | -- | 1 | -- | 1 | -- |
| Living Sq. Feet | 2,521 | 1,784 | $14,740 | 1,922 | $11,980 | 2,587 | -$1,320 |
| Bdrm · Bths · ½ Bths | 3 · 2 | 3 · 2 | -- | 3 · 2 | -- | 4 · 3 | -$6,000 |
| Total Room # | 6 | 6 | -- | 6 | -- | 8 | -- |
| Garage (Style/Stalls) | Attached 2 Car(s) | Attached 2 Car(s) | -- | Attached 1 Car | $2,000 | Attached 2 Car(s) | -- |
| Basement (Yes/No) | No | No | -- | Yes | -$500 | No | -- |
| Basement (% Fin) | 0% | 0% | -- | 0% | -- | 0% | -- |
| Basement Sq. Ft. | -- | -- | -- | 480 | -- | -- | -- |
| Pool/Spa | -- | -- | -- | -- | -- | -- | -- |
| Lot Size | 1.38 acres | 0.54 acres | $1,680 | 1.08 acres | -- | 0.83 acres | $1,100 |
| Other | None | None | -- | None | -- | None | -- |
| Net Adjustment | -- | | +$17,145 | | -$3,295 | | -$32,220 |
| Adjusted Price | -- | | $266,145 | | $258,705 | | $265,780 |

* Listing 1 is the most comparable listing to the subject.
¹ Comp's "Miles to Subject" was calculated by the system.
² Comp's "Miles to Subject" provided by Real Estate Professional.
³ Subject $/ft based upon as-is sale price.

# DRIVE-BY BPO
by ClearCapital

800 BRADLEY ST
COVINGTON, GA 30016

Loan Number

$260,000
● As-Is Value

## Current Listings - Cont.

**Listing Comments** Why the comparable listing is superior or inferior to the subject.

**Listing 1**  Fair market comparable. Property is equal in condition but inferior in age to the subject. 4-sided brick, fenced back yard. Windows, HVAC, furnace, and water heater replaced approximately 5 years ago. No HOA.

**Listing 2**  Fair market comparable. Property is inferior in GLA but superior in condition to the subject. Fantastic 3 bedroom home in sought after Covington, GA location. You'll enjoy preparing meals in the gorgeous kitchen with sleek counters, tiled backsplash, stainless appliances, and beautiful spacious cabinetry. Entertaining is a breeze with this great floor plan complete with a cozy fireplace. The primary bedroom features plush carpet, a spacious closet, and a private bathroom. Lush green landscape surrounds this beautiful house. Hurry, this won't last long! This home has been virtually staged to illustrate its potential.

**Listing 3**  Fair market comparable. Property is inferior in lot size but superior in bed count to the subject. Recently updated 4 Bedroom, 3 Bath split foyer featuring a main level vaulted ceiling family room with fireplace, kitchen with new cabinets, new countertops & new appliances, breakfast area, formal dining room, spacious master with trey ceiling & walk-in closet, master bath with soaking tub & separate shower, 2 spacious bedrooms, hall bath, lower level 2nd family room, bedroom, full bath, laundry closet, rec/storage room & two car garage. Deck overlooking a large level backyard. Move in ready with fresh paint & new carpet.

# DRIVE-BY BPO
by ClearCapital

**100 BRADLEY ST**
COVINGTON, GA 30016

Loan Number

**$260,000**
As-Is Value

## Recent Sales

| | Subject | Sold 1 * | | Sold 2 | | Sold 3 | |
|---|---|---|---|---|---|---|---|
| Street Address | 100 Bradley St | 65 Kristen Pl | | 244 Creekside Trl | | 280 Highgrove Dr | |
| City, State | Covington, GA | Covington, GA | | Covington, GA | | Covington, GA | |
| Zip Code | 30016 | 30016 | | 30016 | | 30016 | |
| Datasource | Tax Records | MLS | | MLS | | MLS | |
| Miles to Subj. | -- | 2.85 ¹ | | 0.55 ¹ | | 0.88 ¹ | |
| Property Type | SFR | SFR | | SFR | | SFR | |
| Original List Price $ | -- | $200,000 | | $290,000 | | $285,000 | |
| List Price $ | -- | $208,000 | | $290,000 | | $295,000 | |
| Sale Price $ | -- | $222,000 | | $275,000 | | $295,000 | |
| Type of Financing | -- | Conventional | | Conventional | | Conventional | |
| VALUE ADJUSTMENTS | Description | Description | +(-) Adj. | Description | +(-) Adj. | Description | +(-) Adj. |
| Date of Sale | | 09/30/2021 | $1,000 | 01/14/2022 | $1,000 | 03/31/2022 | $1,000 |
| DOM · Cumulative DOM | -- · -- | 119 · 119 | -- | 36 · 36 | -- | 76 · 76 | -- |
| Age (# of years) | 18 | 17 | | 17 | | 17 | |
| Condition | Fair | Fair | | Average | -$18,000 | Average | -$18,000 |
| Sales Type | -- | Fair Market Value | -- | Fair Market Value | -- | Fair Market Value | -- |
| Location | Neutral ; Residential | Neutral ; Residential | -- | Neutral ; Residential | -- | Neutral ; Residential | -- |
| View | Neutral ; Residential | Neutral ; Residential | -- | Neutral ; Residential | -- | Neutral ; Residential | -- |
| Style/Design | 1 Story Ranch | Split Split entry | -$1,000 | 1.5 Stories Cape cod | -$500 | 2 Stories Colonial | -$1,500 |
| # Units | 1 | 1 | -- | 1 | -- | 1 | -- |
| Living Sq. Feet | 2,521 | 1,855 | $13,320 | 2,900 | -$7,580 | 2,322 | $3,980 |
| Bdrm · Bths · ½ Bths | 3 · 2 | 3 · 3 | -$2,000 | 4 · 3 | -$6,000 | 4 · 2 · 1 | -$5,000 |
| Total Room # | 6 | 6 | -- | 8 | -- | 7 | -- |
| Garage (Style/Stalls) | Attached 2 Car(s) | Attached 2 Car(s) | -- | Attached 2 Car(s) | -- | Attached 2 Car(s) | -- |
| Basement (Yes/No) | No | Yes | -$1,000 | Yes | -$1,000 | No | -- |
| Basement (% Fin) | 0% | 100% | -- | 100% | -- | 0% | -- |
| Basement Sq. Ft. | | 606 | | 2,175 | | | |
| Pool/Spa | -- | -- | -- | -- | -- | -- | -- |
| Lot Size | 1.38 acres | 1.07 acres | -- | 1.03 acres | -- | 1.3 acres | -- |
| Other | None | None | -- | None | -- | None | -- |
| Net Adjustment | -- | | +$10,320 | | -$32,080 | | -$19,520 |
| Adjusted Price | -- | | $232,320 | | $242,920 | | $275,480 |

* Sold 1 is the most comparable sale to the subject.
¹ Comp's "Miles to Subject" was calculated by the system.
² Comp's "Miles to Subject" provided by Real Estate Professional.
³ Subject $/ft based upon as-is sale price.

# DRIVE-BY BPO
by ClearCapital

500 BRADLEY ST
COVINGTON, GA 30016

Loan Number

**$260,000**
● As-Is Value

---

### Recent Sales - Cont.

**Reasons for Adjustments**  Why the comparable sale is superior or inferior to the subject.

**Sold 1**  Fair market comparable. Property is equal in age but superior in bath count to the subject. BACK ON THE MARKET-Need Space and land. Look no further this home is over an acre of land with newer roof, water heater, and septicTank Line. Freshly painted interior ready for your own touches. This home features 3 bedrooms with 3 full baths, a fully finish basementwith a flex room for a possible 4th bedroom and a living area. The Roof and water heater is new. Septic was services in 2020 with new fieldpump added by owner. HVAC was replaced in 2013. There will be NO REPAIRS. AS IS NEEDS COSMETIC WORK ONLY.

**Sold 2**  Fair market comparable. Property is superior in bath count but equal in lot size to the subject. COME SEE THIS WELL MAINTAINED RANCH HOME ON A VERY QUITE, SAFE AND STABLISHED NEIGHBORHOOD. THIS IMMACULATE HOME SITSON 1.03 ACRES OF LAND WHICH FEATURES 3 BEDROOMS AND 2 BATHROOMS ON THE MAIN LEVEL, A FULL FINISHED BASEMENT THATINCLUDES 1 BEDROOM PLUS AN ADDITIONAL BONUS ROOM ALONG WITH A FULL BATHROOM. IT HAS A PRIVATE OUTSIDE ENTRY TO A VERYLARGE BACKYARD PERFECT FOR ENTERTAINING.YOU MAY ENJOY PRIVACY AND NATURE ALL WHILE RELAXING ON YOUR BACK DECK ORCOOL EVENINGS ON YOUR FRONT COVERED PORCH. KITCHEN OFFERS A BREAKFAST AREA ALONG WITH SLIDING DOORS LEADING TO THEBACK DECK. HURRY!! THIS HOME WONT LAST!!! LOCATED 13 MINUTES FROM THE SQUARE WITH ALL OF IT'S EVENTS ( CONCERTS, CARSHOWS, MOVIE FILMING'S ). TONS OF SHOPPINGS AND FOODS CLOSE BY AS WELL AS PARKS AND LIBRARY.

**Sold 3**  Fair market comparable. Property is superior in bed count but inferior in GLA to the subject. This home is waiting on you to bring your finishing touches. Relax and enjoy this 2 story 4 bedroom 2.5 bath home that sits on over an acre of land. Homefeatures a nice living room with fireplace, separate dining area. All bedrooms are on 2nd floor. Can we say "WOW" to the huge master closet. Longcreeksubdivision is a great place to call home with no HOA! Call today to schedule your showing.

# DRIVE-BY BPO
by ClearCapital

**800 BRADLEY ST**
COVINGTON, GA 30016

Loan Number

**$260,000**
⬤ As-Is Value

## Subject Sales & Listing History

| | | |
|---|---|---|
| **Current Listing Status** | Not Currently Listed | **Listing History Comments** |
| **Listing Agency/Firm** | | No sale/listing history for subject available. |
| **Listing Agent Name** | | |
| **Listing Agent Phone** | | |
| **# of Removed Listings in Previous 12 Months** | 0 | |
| **# of Sales in Previous 12 Months** | 0 | |

| Original List Date | Original List Price | Final List Date | Final List Price | Result | Result Date | Result Price | Source |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

## Marketing Strategy

| | As Is Price | Repaired Price |
|---|---|---|
| **Suggested List Price** | $260,000 | $261,000 |
| **Sales Price** | $260,000 | $261,000 |

**Comments Regarding Pricing Strategy**

As per tax record subject owner name is Channell Stephanie I went back 12 months, out in distance 1 mile, and even with relaxing +/-20 year built, +/-20% GLA search criteria I was unable to find any comparables which fit the subject requirements. Due to limited comparable it was necessary to exceed the proximity up to 4 miles, style, condition, year built, closed date and lot size. Subject is located closer to high way, major road and worship. This however, will not have effect on value and marketability. In delivering final valuation, most weight has been placed on CS1 and LC1, as they are most similar to subject condition and overall structure. Subject attributes are from Tax record."Address is faded on mailbox. Verification made visually and via tax "

# DRIVE-BY BPO
by ClearCapital

800 BRADLEY ST
COVINGTON, GA 30016

**$260,000**

Loan Number          ● As-Is Value

---

### Clear Capital Quality Assurance Comments Addendum

**Reviewer's Notes**    The current report has included the most current and most proximate data available to support the price conclusion. The broker's comps are appropriate for the subject's attributes, surrounding amenities and market conditions. Thus, the price conclusion appears to be adequately supported

DRIVE-BY BPO
by ClearCapital

Case 22-57069-lrc    Doc 12-2    Filed 09/28/22    Entered 09/28/22 13:56:12    Desc
Exhibit    Page 56 of 64

600 BRADLEY ST
COVINGTON, GA 30016

Loan Number

$260,000
As-Is Value

## Subject Photos



Front



Address Verification



Side



Side



Street



Street

# DRIVE-BY BPO
by ClearCapital

**800 BRADLEY ST**
COVINGTON, GA 30016

Loan Number

**$260,000**
● As-Is Value

## Subject Photos



Street



Other



Other

# DRIVE-BY BPO
by ClearCapital



500 BRADLEY ST
COVINGTON, GA 30016

Loan Number

**$260,000**
● As-Is Value

## Listing Photos

L1  3364 Concord Corner SE
Conyers, GA 30013



**Front**

L2  46 Russell Braden Road
Covington, GA 30016



**Front**

L3  255 Long Creek Dr
Covington, GA 30016



**Front**

# DRIVE-BY BPO
by ClearCapital



500 BRADLEY ST
COVINGTON, GA 30016    Loan Number    $260,000   ● As-Is Value

## Sales Photos

**S1** 65 KRISTEN PL
Covington, GA 30016



Front

**S2** 244 Creekside Trl
Covington, GA 30016



Front

**S3** 280 Highgrove Dr
Covington, GA 30016



Front

# DRIVE-BY BPO
by ClearCapital

100 BRADLEY ST
COVINGTON, GA 30016

$260,000
Loan Number    As-Is Value

## ClearMaps Addendum

**Address** ★ 100 Bradley St, Covington, GA 30016
**Loan Number**          **Suggested List** $260,000    **Suggested Repaired** $261,000    **Sale** $260,000



| Comparable | | Address | Miles to Subject | Mapping Accuracy |
|---|---|---|---|---|
| ★ | Subject | 100 Bradley St, Covington, GA 30016 | -- | Parcel Match |
| L1 | Listing 1 | 3364 Concord Corner Se, Conyers, GA 30013 | 3.98 Miles [1] | Parcel Match |
| L2 | Listing 2 | 46 Russell Braden Road, Covington, GA 30016 | 0.32 Miles [1] | Parcel Match |
| L3 | Listing 3 | 255 Long Creek Dr, Covington, GA 30016 | 1.73 Miles [1] | Parcel Match |
| S1 | Sold 1 | 65 Kristen Pl, Covington, GA 30016 | 2.85 Miles [1] | Parcel Match |
| S2 | Sold 2 | 244 Creekside Trl, Covington, GA 30016 | 0.55 Miles [1] | Parcel Match |
| S3 | Sold 3 | 280 Highgrove Dr, Covington, GA 30016 | 0.88 Miles [1] | Parcel Match |

[1] The Comparable "Distance from Subject" value has been calculated by the Clear Capital system.
[2] The Comparable "Distance from Subject" value has been provided by the Real Estate Professional.

# DRIVE-BY BPO
by ClearCapital

**800 BRADLEY ST**
COVINGTON, GA 30016

Loan Number

**$260,000**
● As-Is Value

---

### Addendum: Report Purpose

#### Market Approach and Market Time

The Market Approach of this report, as established by the customer, is: **Other**. (See definition below.)
The Marketing Time as specified by the customer is **Typical**. (See definition below.)

| Definitions: | |
|---|---|
| Fair Market Price | A price at which the property would sell between a willing buyer and a willing seller neither being compelled by undue pressure and both having reasonable knowledge of relevant facts. |
| Distressed Price | A price at which the property would sell between a willing buyer and a seller acting under duress. |
| Marketing Time | The amount of time the property is exposed to a pool of prospective buyers before going into contract. The customer either specifies the number of days, requests a marketing time that is typical to the subject's market area and/or requests an abbreviated marketing time. |
| Typical for Local Market | The estimated time required to adequately expose the subject property to the market resulting in a contract of sale. |

DRIVE-BY BPO
by ClearCapital

800 BRADLEY ST
COVINGTON, GA 30016

Loan Number

$260,000
● As-Is Value

Case 23-57069-lrc    Doc 12-2    Filed 09/28/22    Entered 09/28/22 13:56:12    Desc
Exhibit    Page 62 of 64

## Addendum: Report Purpose - cont.

### Report Instructions

This section shows the instructions that were approved by the customer and provided to the broker prior to completing the report.
*** Customer Supplied Subject Information: Quick Sale Value needed, subject assumed to be in below average or fair condition, comps should be below average or fair condition ***

Instructions last updated: 7/9/2021
Customer specific instructions:
SUBJECT PROPERTY CONDITION ASSUMPTION:
1. Please assume the subject's interior condition is below average or fair (C4, C5 or C6)
COMP SELECTION:
1. Comparable properties that exhibit below average or fair condition should be used
2. Use of remodeled, updated or otherwise good condition properties should be avoided.
PRICING STRATEGY:
1. The purpose of this report is to provide a QUICK SALE price estimate that the property would sell for in an open market
2. As-Is (60-90 Day): should indicate the price the property would sell for in an accelerated timeline in its present condition, under 30 days exposure to the market
3. As-is (Quick Sale) should MATCH the 60-90 day value
4. As-Repaired price estimate: Assume all repair items are completed, provide an estimated price the subject would sell for.
Purpose:
The purpose of this report is to provide a QUICK SALE price estimate that the property would sell for in an open market
Non Visible
If the subject is not visible from the road due to being down a long driveway or in a gated community, please upload a photo of the gate or driveway showing the subject is not accessible. Please add commentary to the report stating why the subject is not visible. Please upload a MLS photo of the subject (if available) to the report and add commentary stating it is the MLS photo. Please proceed with the report.
Comparable Requirements:

If any of the following comparable criteria cannot be met, commentary is required as to why you expanded your search, and what the effect on price will be.

1. Use comps from the same neighborhood, block or subdivision.
2. Comparable properties that exhibit below average or fair condition should be

DRIVE-BY BPO

by ClearCapital

Case 22-57069-lrc    Doc 12-2    Filed 09/28/22    Entered 09/28/22 13:56:12    Desc
Exhibit    Page 63 of 64

400 BRADLEY ST
COVINGTON, GA 30016    Loan Number    $260,000
●  As-Is Value

## Report Instructions - cont.

used.

3. Use of remodeled, updated or otherwise good condition properties should be avoided.

4. Use comps that have closed in the past 3 months to show the current market conditions. In rapidly changing markets, active listing comps should be given equal or greater weight than sold comps in your analysis.

5. Please copy and paste MLS Commentary for each Listing and Sales comp into the 'Comments and 'Reasons for Adjustments sections of the comp grid

Property Condition Definitions:

1. Poor: Uninhabitable or severely damaged from fire, flood, vandalism or mold

2. Fair: Repairs needed, may not be eligible for all forms of financing, below the neighborhood average

3. Average: Minor cosmetic or no repairs needed; typical for the neighborhood, move-in ready but no significant updates or renovations

4. Good: Above average, move in ready, no repairs necessary and has recent and significant updates and/or renovations (or, for customers that do not provide for 'Average', any move-in ready property)

5. Excellent: Newer construction (1-5 years) or high end luxury

Standard Instructions:

1. Clear Capital Code Of Conduct - Please make sure that you are always abiding by the Clear Capital Code of Conduct when completing valuation reports.

2. If the subject is currently listed, please consider all available information pertaining to the subject's condition. This information should be utilized when developing the assumption of the subject's condition.

3. Use the subject characteristics provided in the report Grid (if preloaded) to evaluate the property. This information is from a full interior appraisal and is assumed to be most accurate. If your inspection reveals obvious inaccuracies, please explain in the narrative of the report.

4. Include sufficient detail to help our mutual customer gain a complete understanding of the subject's neighborhood such as neighborhood desirability, amenities, parks, schools, commercial or industrial influences, REO activity, traffic, board-up-homes, etc.

5. Do not approach occupants or owners.

6. If the subject is a Commercial property, contact Clear Capital immediately at 530-582-5011 for direction on how to proceed with the report.

7. Please do not accept if you or your office has completed a report on this property in the last month, are currently listing this property, or have any vested interest in the subject property.

8. Clear Capital does not allow any log ins from IP addresses from foreign countries. This includes, but is not limited to; data entry services, form completion services, etc. Also, it is against Clear Capital code of conduct to share your password with anyone who is not a W2 employee in your office.

9. Clear Capital and our mutual customers greatly appreciate your expertise. If you cannot personally inspect the property, select comparables, and determine a price for the subject, please do not accept this report. Per the standards and guidelines adopted by Clear Capital and other industry leaders, the use of assistants to complete any of the aforementioned tasks is not permitted.

10. No part of your analysis or reporting may be based on the race, color, religion, sex, actual or perceived sexual orientation, actual or perceived gender identity, age, actual or perceived marital status, disability, familial status, national origin of either the prospective owners or occupants of the subject property, present owners or occupants of the property, or present owners or occupants of the properties in the vicinity of the subject property, or on any other basis prohibited by federal, state or local law.

Terms of Use, Code of Conduct and Professional Discretion

If you accept and perform this assignment, you do so in accordance with the Clear Capital Vendor Agreement Terms of Use and Code of Conduct to which you agreed.

All interactions with consumers (borrowers, homeowners, POCs, etc.) must be performed in a professional manner. Should you observe any concerning or suspicious activity while you engage with a consumer whether onsite or otherwise, please contact Clear Capital immediately. Please refrain from discussing anything related to the observation with the consumer directly. This includes suspected elder abuse, elder financial abuse, vulnerable adults, fraud, forgery or any violations of local, state or federal laws.

Due to the importance of an independent opinion of price, please do not discuss your price with anyone or be influenced by list price, pending offers, accept comp packets, repair estimates or the listing agent's opinion.

Photo Instructions:

In the case of camera malfunction and/ or if an inspector fails to inspect the property, it is prohibited to request another individual for photos.

1. Photos should be clear of car window glare, door frames, and mirrors.
2. Current and original photos of all sides of the subject (back of the subject in available)
3. Damages (upload enough photos to support your repair cost estimates)
4. Please provide close up photos of the subjects roof
5. Two street scene photos, one looking each direction down the street
6. One view photo looking across the street from the subject
7. One address verification photo
8. MLS photos of all (3) sold comparables, if available
9. MLS photos of all (3) listing comparables, if available

# DRIVE-BY BPO
by ClearCapital

**100 BRADLEY ST**
COVINGTON, GA 30016

Loan Number

**$260,000**
● As-Is Value

## Broker Information

| | | | |
|---|---|---|---|
| **Broker Name** | Philana Johnson | **Company/Brokerage** | Opulence PR Group LLC |
| **License No** | 338394 | **Address** | 25 BARBERRY CIR COVINGTON GA 30016 |
| **License Expiration** | 03/31/2023 | **License State** | GA |
| **Phone** | 6785171284 | **Email** | jazzyrealtor7@gmail.com |
| **Broker Distance to Subject** | 1.36 miles | **Date Signed** | 08/12/2022 |

*By confirming the above contact and real estate license information and submitting the report, the above signed hereby certifies and agrees that: 1) I personally took the pictures, selected comparables, and determined the price conclusion. 2) To the best of my knowledge, the statements of fact contained in this report are true and correct. 3) The reported analyses, opinions, and conclusions are my personal, impartial, and unbiased professional analyses, opinions, and conclusions. 4) I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved. 5) I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment. 6) My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined price point. 7) I did not base, either partially or completely, my analysis and/or opinion and conclusions in this report on race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law. 8) I maintain errors and omissions insurance, to the extent required by state law, for all liability associated with the preparation of this Report.*

### Disclaimer

**This document is not an appraisal as defined by USPAP (Uniform Standards of Professional Appraisal Practice). It is not to be construed as an appraisal and may not be used as such for any purpose.**

**Unless otherwise specifically agreed to in writing:**
**The intended purpose of this report is to assist the Clear Capital account holder in making decisions within the scope of applicable statutory and regulatory requirements and performing required due diligence. This document is provided solely for the use of the Clear Capital account holder and not any other party, is not intended as any guarantee of value and/or condition of the subject property and should not be relied on as such. In the event that this document is found to be defective, incorrect, negligently prepared or unfit for its authorized use, Clear Capital's sole liability shall be to promptly refund the total fee expended by the account holder for this report or to replace it at no charge to the account holder, but in no event shall Clear Capital be responsible to the account holder for any indirect or consequential damages whatsoever. This warranty is in lieu of all other warranties, express or implied, except where otherwise required by law. The account holder shall notify Clear Capital within thirty (30) days of this report's delivery to the account holder if it believes that this document is defective, incorrect, negligently prepared or unfit for its authorized use. Under no circumstances may Clear Capital forms or their contents be published, copied, replicated, or mimicked.**